UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**MEN OF DESTINY MINISTRIES, INC.,**

**Plaintiff,**

**-vs-** **Case No. 6:06-cv-624-Orl-31DAB**

**OSCEOLA COUNTY, FLORIDA,**

**Defendant.**

---

# MEMORANDUM OPINION

The Plaintiff, Men of Destiny Ministries, Inc. ("MDM"), provides a rehabilitation program for men addicted to drugs or alcohol. The Defendant, Osceola County, Florida (the "County"), attempted to evict MDM from a group home near St. Cloud, Florida for failing to comply with the Osceola County Land Development Code (the "Code"). In response, MDM filed the instant suit, contending that the County's actions violated the Religious Land Use and Institutionalized Person Act of 2000, 42 U.S.C. §2000cc *et seq.,* ("RLUIPA") (Count I); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101-12213 ("ADA") (Count II); the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (Count III); the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA") (Count IV); the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count V); the right to free speech contained in the First Amendment to the United States Constitution (Count VI); the right to peaceable assembly contained in the First Amendment to the United States Constitution (Count VII); the right to free exercise of religion contained in the First Amendment to the United States Constitution (Count VIII); and Florida's Religious Freedom Restoration Act of

1988, Fla. Stat. § 761.01 (the "FRFRA") (Count IX). A bench trial was held before the undersigned on July 26-28, 2006. Having thoroughly considered the evidence and argument of counsel, the Court enters its findings of fact and conclusions of law.

**I. Jurisdiction and Venue**

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue.

**II. The Facts**

MDM is a Florida not for profit corporation that operates a residential drug and alcohol rehabilitation program in Osceola County, Florida. MDM's president, George Shafter ("Shafter"), serves as the pastor of the program, which he refers to as a "Christian discipleship program." (Doc. 82 at 43-44). Much of the program is religious in nature, with participants required to, among other things, attend Bible study classes and worship services. (Doc. 1 at 8). The program also imposes strict discipline on the participants by way of mandatory curfews and requirements that overseers know of the participants' whereabouts at all times when they are outside the residence. (Doc. 1 at 8). Shafter describes the program as one of "regeneration" rather than "rehabilitation" (Doc. 82 at 45-46), but the distinction is not material for purposes of this case.[1]

MDM relocated its program to a house at 3575 Michigan Avenue in Osceola County in July 2005. (Doc. 1 at 4). Shafter and his wife own the house and the two acres on which it sits, leasing the property to MDM. (Doc. 82 at 58). The house is located in an E-2A zoning district. (Doc. 1 at 4) "E-2A" is a residential classification – one of five "Estate Development"

---

[1]In its verified complaint, MDM described itself as operating "a residential drug and alcohol rehabilitation program." (Doc. 1 at 4).

classifications in the Code – with two-acre minimum lots. (Code at 14-18). Single-family homes and certain ancillary uses – such as servant's quarters or stables – are permitted as of right in E-2A. (Code at 14-16). More intense uses, such as houses of worship and nursing homes, may be permitted if approved as a "conditional use". (Code at 14-17).

What is referred to as a "Community Residential Home A" is also permitted as of right in the E-2A district (Code at 14-16), while a "Community Residential Home B" may be permitted if approved as a conditional use (Code at 14-17). The Code defines a community residential home as a "dwelling unit licensed to serve clients of the Department of Children & Families". (Code at 14-83). A Community Residential Home A can have no more than six residents, while a Community Residential Home B can have between seven and 14 residents. (Code at 14-83). The parties agreed that districts exist in Osceola County where a Community Residential Home B may exist as of right. So far as the record shows, during the period relevant to this suit, MDM had more than seven residents in the Michigan Avenue house. (Doc 82 at 71; Doc. 79 at 114). At least some (if not all) of those residents were recovering drug addicts or alcoholics, and many (if not all) had criminal records. (Doc. 79 at 40-47). It is undisputed that MDM is not licensed to serve clients of the Department of Children & Families, although MDM contends it was notified that the religious nature of its program made it exempt from the licensing requirement.

Prior to MDM moving in, the house on Michigan Avenue had suffered hurricane damage. (Doc. 82 at 51). MDM repaired that damage and began making alterations to the house, including such things as converting the garage and a carport into additional living space. (Doc. 82 at 60). MDM did not obtain the necessary permits for at least some of the renovations. (Doc. 82 at 61).

The renovations came to the attention of Osceola County Zoning/Code Enforcement ("Code Enforcement"), which inspected the house on September 20, 2005. (Doc. 82 at 64). Code Enforcement cited MDM for improperly allowing the property to be used for multi-tenant occupancy, for making alterations without permits, and for allowing the house to be used for a purpose for which it was not zoned – specifically, the residential rehabilitation program. (Plaintiff's Exh. 1 at 1). By letter dated October 26, 2005, Code Enforcement gave MDM two weeks to remedy the violations. (Plaintiff's Exh. 1 at 2). MDM halted the construction, acquired the proper building permits, and began the process of applying for a conditional use permit ("CUP") that would permit operation of the rehabilitation program on the property. (Doc. 82 at 65-71). MDM also moved the administrative and classroom aspects of the program to another site. (Doc 82 at 71). However, at a November 16, 2005 hearing, the Osceola County Code Enforcement Board found that violations continued at the property. (Plaintiff's Exh. 2 at 1). The board notified MDM that failure to remedy the problems by 8 a.m. the next day would result in a $200 per day fine. (Plaintiff's Exh. 2 at 2).

MDM continued working with the County to try to get a CUP to operate as a Community Residential Home B or as a "men's discipleship program" on the property. (Doc. 79 at 13-19). MDM representatives met with members of the Osceola County Planning Commission (the "Planning Commission"), which makes investigates and makes recommendations to the Board of County Commissioners regarding such things as CUP applications. (Doc. 1 at 14). Members of the Planning Commission staff recommended approval of MDM's CUP, subject to certain conditions.

Some of MDM's neighbors, however, vigorously opposed granting of the CUP. A dozen spoke against the measure at a March 2, 2006 meeting of the Planning Commission itself. (Doc. 1 at 15). Some said the facility was not compatible with the residential neighborhood, while others stated (or implied) that the alcoholics, drug addicts and criminals who resided in the house would pose a threat to the health and safety of neighborhood residents. (Doc. 1 at 15-16). The Planning Commission voted 6-2 to recommend denial of MDM's CUP application. (Doc. 1 at 16).

MDM met with members of the County Commission who would make the final decision on the CUP application, and numerous neighbors e-mailed commissioners to express their opposition. Again, many of the unhappy neighbors expressed their beliefs that a residential drug and alcohol rehabilitation facility was incompatible with the residential character of the neighborhood or that the facility's residents posed a threat to the health and safety of the people living or going to school in the neighborhood. (Doc. 1 at 17-22). By a vote of four to zero, the commissioners voted to deny the CUP and give MDM 45 days to relocate to a new location. (Doc. 1 at 23). The commissioners primarily cited compatibility concerns, rather than health and safety concerns, in explaining their decisions. (Doc. 1 at 22-23). The commissioners subsequently testified before this Court regarding the decision to deny the CUP application, and all denied that they made their decision based on the residents' status as recovering alcoholics and drug addicts, or based on the religious character of the MDM program. (Doc. 80 at 308-65).

At trial, MDM abandoned its facial challenge to the Code. (Doc. 82 at 32).

## III. Legal Analysis

The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994). That is, a

plaintiff bears the burden of satisfying the finder of fact that he has proven every element of his claim by a preponderance of the evidence. A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved "is more likely true than not true." See Pattern Jury Instructions (Civil Cases) of the Eleventh Circuit, Basic Instruction No. 6.1 (2000). In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *See generally Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993).

Because the court acts as both the judge and the jury, it may resolve conflicts in the evidence, as well as make credibility assessments. *Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568 (Fed. Cir. 1984). Finally, the court must set forth "findings of fact and conclusions of law," subject to reversal only if clearly erroneous. Fed. R. Civ. P. 52(c); *Holmes v. Bevilacqua*, 794 F.2d 142, 147 (4th Cir. 1986); *see also Martinez v. U.S. Sugar Corp.*, 880 F. Supp. 773, 775 (M.D. Fla. 1995).[2]

**A. The Religious Land Use and Institutionalized Persons Act (Count I)**

Section (a)(1) of RLUIPA provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –

---

[2] Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

(A) is in furtherance of a compelling interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Section (a)(1) is generally referred to as RLUIPA's "Substantial Burdens" provision. MDM contends that the Osceola Development Code violates the RLUIPA by imposing a substantial burden on its religious exercise without furthering a compelling government purpose. (Doc. 1 at 25).

Under RLUIPA, "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A § 2000cc-5(7)(A). It also includes the "use, building, or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc5(7)(B).

Prior to the passage of RLUIPA, courts considering whether government activity imposed a substantial burden on religious exercise – such as, for example, in cases under the Religious Freedom Restoration Act – generally considered whether the religious exercise implicated by zoning decisions was integral to a believer's faith. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226 (11th Cir. 2004) (citing cases). RLUIPA's definition of religious exercise rejects any such requirement. *Id.* The Court finds that MDM's ministry to men with drug and alcohol problems, which is clearly motivated by the religious beliefs of Shafter (among others) and utilizes religious teaching as part of its methods, constitutes a religious exercise for purposes of the RLUIPA. As such, use of the Michigan Avenue property for that purpose would also constitute a religious exercise.

RLUIPA does not define "substantial burden," and thus the term is to be given its ordinary or natural meaning. *Midrash Sephardi* at 1226. The United States Court of Appeals for the Eleventh Circuit has held that an individual's exercise of religion is substantially burdened if a regulation completely prevents an individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion. *Id.* at 1227. Short of such extremes, however, the Eleventh Circuit has held that a "substantial burden" for purposes of RLUIPA "requires something more than an incidental effect on religious exercise."

> [A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

*Midrash Sephardi* at 1227 (finding that zoning regulations requiring location of synagogues farther away from congregants than preferred location, thus requiring congregants to walk farther and possibly significantly decreasing attendance, was not a substantial burden).[3]

Under these facts, the Court finds that the County refusal of the CUP did not impose a substantial burden on MDM's religious exercise. MDM remains free to relocate its program to another location in the County where it can operate as of right, or to operate its ministry by other methods – such as a non-residential facility, for example – that do not run afoul of the requirements of the Code. There is no argument that Shafter or MDM can exercise their religion *only* at the Michigan Avenue location or *only* by way of the seven-to-fourteen person residential

[3]The *Midrash Sephardi* court also held that commercial unavailability of suitable sites for the synagogues in the properly zoned area could not constitute a substantial burden in that "[t]he harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them." *Id.* at 1227 n.11.

program currently operating there. MDM and Shafter may believe that other locations or other methods would be less convenient or less effective, but so long as other locations and methods are reasonably available, Osceola County has not imposed a substantial burden on MDM's religious exercise.

MDM also argues that the County has violated Section (b)(1) of RLUIPA, the so-called "Equal Terms" provision, which provides in pertinent part

> Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
>
> (2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
>
> (3) Exclusions and limits. No government shall impose or implement a land use regulation that –
>
> (A) totally excludes religious assemblies from a jurisdiction; or
>
> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

MDM contends that it suffered discriminatory treatment for purposes of RLUIPA. Specifically, MDM points out that the Code permits 14 unrelated individuals to reside in a house and have religious study (even when provided by another), but those same 14 individuals could not do so if involved in a religious discipleship program. (Doc. 82 at 31). But MDM is comparing apples and oranges. A group of people living together and engaging in religious study is simply not the same as a residential drug and alcohol rehabilitation facility, even if they share some characteristics. To demonstrate a violation of RLUIPA's Equal Terms provision, MDM would

need to show that a secular rehabilitation facility or the like had been (or would be) treated better than its own religious-based facility. MDM made no such showing.

**B. The Americans with Disabilities Act (Count II)**

MDM complained at trial that certain prejudicial statements expressed by its neighbors were adopted by the Osceola County Commissioners and motivated them to deny the CUP, thus resulting in a violation of the ADA. Section 12132 of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Courts have found that the ADA, Rehabilitation Act, and FHA all apply to municipal zoning decisions. *See*, *e.g.*, *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144 (2nd Cir. 1999).

The ADA's definition of "disability" is drawn almost verbatim from the definition of "handicapped individual" contained in the Rehabilitation Act and the definition of "handicap" contained in the FHA. *Bragdon v. Abbot*, 524 U.S. 624 (1998). The ADA defines disability for an individual as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual [or] a record of such impairment [or] being regarded as having such an impairment." 42 U.S.C. § 12102(2). At trial, MDM demonstrated that most if not all of its residents were handicapped for purposes of the ADA, in that they were at least regarded as having an impairment that substantially limited one or more major life activities.

However, MDM did not demonstrate that the Commission voted to deny the CUP because of its residents' handicaps. Commissioner William Lane testified that he opposed granting the CUP because of the facility's incompatibility with the surrounding residential neighborhood and

because MDM had initially refused to get the required construction permits. (Doc. 80 at 312, 319). He denied that the e-mails and public comments about the health and safety "threats" posed by the program's residents influenced his decision. (Doc. 82 at 321). In his testimony, Commissioner Ken Shipley denied that the drug or alcohol problems of the program's residents affected his vote. (Doc. 82 at 343). Commissioner Atley Mercer testified that he was influenced by MDM's initial failure to get the necessary building permits, by the Planning Commission's negative recommendation, and by incompatibility issues. (Doc. 82 at 363-65). The Commissioners were credible, and the Court finds that MDM's residents were not denied participation or benefits because of their disability.

**C. The Rehabilitation Act (Count III)**

The Rehabilitation Act provides, in pertinent part, that no otherwise qualified individual with a disability in the United States shall "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance". 29 U.S.C. § 794(a). As noted above, MDM failed to show that its residents' disabilities were the motivating factor behind the Commissioners' decision to deny the CUP application, and thus its Rehabilitation Act claim fails.

**D. The Fair Housing Act (Count IV)**

The Fair Housing Act ("FHA") makes it unlawful "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of ... a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available". 42 U.S.C. § 3604(f)(1)(B). Like the ADA, the FHA defines "handicap" as a physical or mental impairment that substantially limits one or more major life activities, or a record of such

impairment, or being regarded as having such an impairment. 42 U.S.C. § 3602(h). Numerous courts have held that recovering drug addicts and alcoholics can be entitled to protection under the FHA. *See*, *e.g.*, *U.S. v. Southern Management Corp.*, 955 F.2d 914, 922-23 (4th Cir. 1992) (holding that FHA's definition of "handicap" should be construed consistently with definition from Rehabilitation Act, which included individuals participating in a supervised rehabilitation program and no longer using drugs, and people erroneously regarded as using drugs) *and Tinch v. Walters*, 765 F.2d 599, 603 (6th Cir. 1985) (finding that recovered alcoholic was a handicapped individual within meaning of Rehabilitation Act). Again, however, this Court's finding that the Commissioners did not deny the CUP because of concerns over the residents' possible drug or alcohol use is fatal to MDM's FHA claim.

**E. Equal Protection (Count V)**

To prevail on an equal protection claim that a defendant unequally applied a facially neutral statute, a plaintiff must show intentional discrimination. *E&T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir. 1987). Mere error or mistake in judgment when applying a facially neutral statute does not violate the Equal Protection clause. *Id.*

As described above, MDM did not demonstrate that the Osceola County Commission intentionally discriminated against MDM's residents on the basis of their religion or their disability. Further, MDM did not even attempt to demonstrate that the County had intentionally discriminated against its residents on the basis of their "content, viewpoint, identity and expression," or any of the other impermissible bases asserted in Count V of the Complaint. (Doc. 1 at 31). Thus, MDM's equal protection claim fails.

**F. Free Speech and Peaceful Assembly (Counts VI and VII)**

Although not explicitly abandoned by MDM, the Free Speech and Peaceful Assembly claims were not mentioned in MDM's trial brief or pursued at trial by MDM's counsel. Indeed, in his opening argument, MDM's counsel listed seven claims that he would prove up but failed to mention the free speech and peaceful assembly claims. To the extent MDM may have wished to pursue these claims at trial, it failed to produce any evidence that it was entitled to prevail, and these claims must fail.

**G. The Florida Religious Freedom Restoration Act and the Free Exercise clause (Counts VIII and IX)**

Florida's Religious Freedom Restoration Act of 1998, Fla. Stat. § 761.01 *et seq* ("FRFRA") provides that government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless the government demonstrates that the burden is in furtherance of a compelling governmental interest and is the least restrictive means for furthering that interest. Fla. Stat. § 761.03. In addition, FRFRA defines "exercise of religion" as "an act or refusal that is substantially motivated by a religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious belief." Fla. Stat.§ 761.02. As is the case under the RLUIPA, the Florida Supreme Court has held for purposes of the FRFRA that a "substantial burden"on the free exercise of religion is one that either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires. *Warner v. City of Boca Raton*, 887 So.2d 1023, 1035 (Fla. 2004).

Based on Shafter's testimony, MDM's efforts to rehabilitate drug addicts and alcoholics are undoubtedly motivated by a religious belief and therefore constitute a religious exercise under the FRFRA. However, the County has not placed a substantial burden on that religious exercise, either through the Code itself or through their denial of the CUP. The County's regulations do not preclude MDM from engaging in this religious exercise. MDM is free to run its rehabilitation program in the other areas of the County that are zoned for the sort of facility it currently operates. And MDM may attempt to rehabilitate these individuals in other ways, such as by operating through counseling rather than by operating an in-patient facility. So long as MDM remains able to attempt to rehabilitate drug addicts and alcoholics, its religious exercise has not been substantially burdened under the FRFRA. *See*, *e.g.*, *Warner*, 887 So. 2d at 1035 (concluding that city's prohibition on vertical grave markers, but not horizontal ones, merely inconvenienced plaintiffs' religious exercise and therefore did not constitute a substantial burden under the FRFRA).

The First Amendment, made applicable to the states through the Fourteenth Amendment, provides in pertinent part that the government shall make no law prohibiting the free exercise of religion. U.S.C.A. Const. Amend. 1. The FRFRA expands the scope of religious protection beyond the conduct considered protected by cases from the United States Supreme Court. *Warner,* 887 So. 2d at 1035. Because the County's actions do not violate the FRFRA, and because the Code is a neutral law of general applicability, MDM's Free Exercise claim must also fail. *Warner v. City of Boca Raton*, 420 F.3d 1308, 1310 (11th Cir. 2005).

## IV. Conclusion

The Court does not doubt that Pastor Shafter and the other individuals leading the MDM are sincere in their efforts to minister to men suffering from addiction to drugs or alcohol. But that sincerity does not shield them from having to comply with the same zoning requirements as secular organizations and organizations not working with the disabled. MDM has not shown that its statutory or constitutional rights have been violated. Accordingly, it is hereby

**ORDERED** that the Clerk enter judgment in favor of the Defendant and close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 6, 2006.

**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party